IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (347) 283-6414 | Case No. 20-MC-749<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Steven Kaplan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (347) 283-6414, with listed subscriber(s) "Country, Country" (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the United States Attorney's Office for the Eastern District of New York, and have been since 2009. Prior, I was a law enforcement officer with the

New York City Police Department (the "NYPD") from 1985 through 2009, including a period of time in the NYPD (i) robbery task force from 1986 through 1988, (ii) narcotics division from 1988 through 1993, and (iii) cold case squad from 1994 through 2009. I have been involved in the investigation of numerous cases involving the illegal trafficking, distribution, and possession of narcotics, as well as numerous cases involving gun possession and gun violence, including gun homicides and robberies involving firearms. I have also received training on the uses and capabilities of cellular telephones in connection with criminal activity.

4. The facts in this affidavit come from my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 have been committed, are being committed, and will be committed by RICHARD JACKSON, together with his co-conspirator JAMAL OMARO, and other unknown individuals, and that violations of Title 18, United States Code, Sections 922 and 924 are being committed and will be committed by JACKSON. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. The United States, in conjunction with the NYPD, is conducting a criminal investigation of RICHARD JACKSON, JAMAL OMARO, and other unidentified subjects regarding possible violations of Title 21, United States Code, Sections 841 and 846, and Title 18 United States Code, Sections 922 and 924.

### Undercover Drug Buys

8. On March 4, 2020, at approximately 3:00 p.m., an undercover officer working for the NYPD ("UC-1") contacted RICHARD JACKSON, also known as "Country," at 347-600-0378 (the "Contact Phone Number") seeking to purchase a quantity of crack cocaine. JACKSON provided UC-1 with a time and location to meet JACKSON's friend. Specifically, JACKSON directed UC-1 to meet the friend at a supermarket at 1351 Forest Avenue, Staten Island, New York 10302, located in the Eastern District of New York (the "Forest Avenue Market"). At approximately 4:55 p.m., JACKSON called UC-1 and directed him to meet the friend, later identified by UC-1 through a photo array as JAMAL OMARO, in the bathroom of the Forest Avenue Market.

9. UC-1 proceeded to the bathroom and purchased approximately 0.857 grams of crack cocaine from JAMAL OMARO in exchange for $100USD.

10. On March 12, 2020, at approximately 12:45 p.m., UC-1 contacted RICHARD JACKSON at the Contact Phone Number to arrange the purchase of a quantity of crack cocaine. JACKSON provided UC-1 with a time and location to meet JACKSON's friend. Specifically, JACKSON directed UC-1 to meet JACKSON's friend at the Forest Avenue Market. At approximately 1:43 p.m., JACKSON called UC-1 and directed him to go into the bathroom to meet with his friend, who has been identified as JAMAL OMARO.

11. UC-1 proceeded to the bathroom and purchased approximately 0.816 grams of crack cocaine from JAMAL OMARO in exchange for $100USD.

12. On March 17, 2020, at approximately 12:00 p.m., UC-1 contacted RICHARD JACKSON at the Contact Phone Number to arrange the purchase of a quantity of crack cocaine. JACKSON informed UC-1 that JACKSON would send a friend to meet UC-1 at 1 Davis Avenue, Staten Island, New York 10310 (the "Davis Avenue Location"). At approximately 12:47 p.m., JACKSON's friend, who has been identified as JAMAL OMARO, parked a gray Cadillac Escalade with license plate HKF3434 (the "Omaro Car") in front of UC-1's vehicle. UC-1 entered the passenger side of the Omaro Car and was provided approximately 0.752 grams of crack cocaine in exchange for $100USD.

13. On March 25, 2020, at approximately 12:10 p.m., UC-1 contacted RICHARD JACKSON at the Contact Phone Number to arrange the purchase of a quantity of crack cocaine. JACKSON informed UC-1 that JACKSON would send a friend to meet UC-1 at the Davis Avenue Location. At approximately 12:53 p.m., JACKSON'S friend, who has been identified as JAMAL OMARO, driving the Omaro Car, parked in front of UC-1's vehicle, stood by the passenger side of UC-1's vehicle, and provided UC-1 with approximately 0.654 grams of crack cocaine in exchange for $100USD.

14. In advance each purchase, UC-1 called RICHARD JACKSON at the Contact Phone Number to set a time and location to meet.

Telephone Contact and Numbers

15. On March 10, 2020, Judge Mario F. Mattei of the Richmond County Supreme Court issued a sixty-day pen register in connection with the Contact Phone Number. Based on information obtained from that pen register, on March 12, 17, and 25, there are no calls to or

from the Contact Phone Number to any one telephone number before or after RICHARD JACKSON spoke with UC-1 to organize the drug buy (the "UC Communications"). Based on my training and experience, this provides a reasonable basis to believe that JACKSON used a second phone to contact JAMAL OMARO to coordinate the drug deliveries.

16. In 2019, RICHARD JACKSON was arrested for an unrelated charge and provided as his telephone number as that of the Target Cell Phone. Based on a subpoena issued to T-Mobile, the subscriber information for the Target Cell Phone is the same as that for the Contact Phone Number. The name associated with both of these accounts is "Country, Country." Country is a known street name for JACKSON.

17. In response to subpoenas, T-Mobile provided phone records for the Target Cell Phone, which show that, around the time of the UC Communications, the Target Cell Phone was in contact with the telephone number (347) 729-2500 (the "Delivery Phone Number").

18. An Accurint report shows that the Delivery Phone Number is registered to JAMAL OMARO.

19. On March 12, 2020, there was an incoming call made to the Contact Phone Number from UC-1 at 12:44 p.m. At 12:45 p.m. a call was made from the Target Cell Phone to the Delivery Phone Number. At 1:43:11 p.m. a call was made from the Delivery Phone Number to the Target Cell Phone, and at 1:43:34, RICHARD JACKSON called UC-1 from the Contact Phone Number to direct UC-1 to proceed to the bathroom in the Forest Avenue Market for the exchange.

20. On March 17, 2020, there were various communications between UC-1 and the Contact Phone Number, including one at 11:43 a.m. and one at 11:46 a.m. At 11:45 a.m. and 11:48 a.m. there are outgoing calls from the Target Cell Phone to the Delivery Phone Number.

The drug buy took place at 12:47 p.m. and there was an incoming call from the Delivery Phone Number to the Target Cell Phone at 12:47 p.m.

21.     On March 25, 2020, there were various calls between UC-1 and the Contact Phone Number, including a call from UC-1 at 12:11 p.m.  At 12:12 p.m. there was a call made from the Target Cell Phone to the Delivery Phone Number.

22.     UC-1 intends to continue making purchases of narcotics from RICHARD JACKSON and JAMAL OMARO.

23.     In addition, UC-1 and RICHARD JACKSON have discussed the purchase of a firearm.  JACKSON informed UC-1 that he is currently in the "South."  Prior to JACKSON's departure for his trip to the South, UC-1 asked JACKSON if he could bring back a firearm for UC-1.  JACKSON agreed to do so.  During the March 25, 2020 exchange, JAMAL OMARO informed UC-1 that JACKSON was bringing back three firearms from the South.  Both JACKON and OMARO have prior felony convictions.

## Conclusions

24.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers

covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

25. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

26. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

28.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

29.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

30.  I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

31.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*steven kaplan*

Steven Kaplan
Special Agent
United States Attorney's Office, EDNY


Subscribed and sworn to before me on April  3 , 2020

_____
Honorable Ramon E. Reyes
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number (347) 283-6414, with listed subscriber(s) "Country, Country" (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.     **Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841 and 846 involving RICHARD JACKSON, JAMAL OMARO, and other unidentified subject(s), and evidence of violations of Title 18, United States Code, Sections 922 and 924 involving JACKSON.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.